# EXHIBIT 2

MC-275

| | |
|---|---|
| Name | An Dao |
| Address | Correctional Training Facility |
| | P.O. Box 689 (Y-207(U)) |
| | Soledad, CA 93960-0689 |
| CDC or ID Number | E-28538 |

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

SEP 29 2006

ALAN SLATER, Clerk of the Court

BY: C. MASON, DEPUTY

## THE SUPERIOR COURT OF CALIFORNIA

## ORANGE COUNTY

(Court)

| |
|---|
| An Dao |
| Petitioner |
| vs. |
| B. Curry, Warden (A) |
| Respondent |

### PETITION FOR WRIT OF HABEAS CORPUS

No. M-11026

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED

7. **Ground 2** or **Ground** _____ *(if applicable)*:

_____

_____

_____

_____

a.  Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [X] Other *(specify):* Illegal denial of Parole suitability by Board of Prison Terms

1. Your name: **An Dao**

2. Where are you incarcerated? **Correctional Training Facility - Soledad**

3. Why are you in custody? [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Murder and attempted murder**

   b. Penal or other code sections: **P.C. 187 & 664/187**

   c. Name and location of sentencing or committing court: **Orange County Superior Court**

   d. Case number: **SC # C70863**

   e. Date convicted or committed: **6-14-1989**

   f. Date sentenced: **8-18-1989**

   g. Length of sentence: **15 to life & 7 yeras inhancement**

   h. When do you expect to be released? **Unknown**

   i. Were you represented by counsel in the trial court? [X] Yes.    [ ] No. If yes, state the attorney's name and address:

   **Gerald Reopehe; Newport Place, 10th Floor, Newport Beach, CA, 92660; (714) 972-9293**

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE
SECTION 3041 (b) [THE EXCEPTION] TO FIND PETITIONER
UNSUITABLE FOR PAROLE, THE DECISION WAS ARBITRARY AND
CAPRICIOUS, IN DIRECT VIOLATION OF PETITIONER'S STATE
AND FEDERAL DUE PROCESS RIGHTS. THE IS NOT A MODICUM
OF EVIDENCE THAT PETITIONER IS A CURRENT THREAT TO
SOCIETY OR UNSUITABLE FOR PAROLE.

On June 27, 2005, Petitioner An Dao, (Hereinafter "Petitioner"),

was provided with a Life Term Parole Consideration Hearing before

the Board of Prison Terms (Hereinafter "Board"), please refer to

Exhibit "A" which is the Hearing Transcript (Hereinafter "HT".)

Said Board hearing was petitioner's Second (2) parole suitability

hearing. Petitioner's minimum eligible release date was January

8, 2003[1]. The purpose of this Board hearing was for the setting

of Petitioner's term uniformly[2] to his offense and for a finding

of suitability for parole (please see Penal Code § 3041.; In re

Rameriz, 94 Cal.App.4th 541 (2001); McQuillion v. Duncan, (9th Cir.)

306 F. 3d 895; In re Norman G. Morrall, (2002) 102 Cal.App.4th 343;

and the very recent Biggs v. Terhune, (2003 9th Cir.) 334 F. 3d

910.)

---

1 — The Court of Appeal in In re George Scott, (2004) 119 Cal.App.4th 871,
reaffirmed the rational of the Rameriz and Smith Courts when it declared "...parole
is the rule, rather than the expectation, and conviction for second degree murder
does not automatically render one unsuitable. (In re Smith, (2003) 114 Cal.App.4th
343, 366). In re Rameriz, supra, 94 Cal.App.4th 549 ...[a]ll violent crimes
demonstrate the perpetrator's potential for posing a grave risk to public safety,
yet parole is mandatory for violent felons serving determinate sentences. Pen.
Code § 3000, subd.(b)(1).) And the Legislature has clearly expressed its intent
that when murders – who are the grate majority of inmates serving indeterminate
sentences – approach their minimum eligible parole date, the Board 'shall normally
set a realese date..'' (id. at p.570).

2 — The Court of Appeal on July 24, 2004, in In re George Scott Supra, 119
Cal.App.4th at 887 fn.7, also reaffirmed the Legislative Intent of Uniform Terms
by stating: "The first two sentences of the DSL declare 'the purpose of
imprisonment for a crime is punishment' and that [t]his purpose is best served
by terms proportionate to the seriousness of the offense with provisions for
uniformity in the sentences of offenders committing the same offense under similar
circumstances." (Pen.Code, § 1170 subd.(a)(1).) Nothing in the DSL or its
legislative concern with uniformity was limited to those serving determinate terms.
Penal Code 3041 shows that this interest does extend to individuals such as
[petitioner] who are serving indeterminate life terms. (id., citing Rameriz, supra,
94 Cal.App.4th at 559.)

1    The consequent result was this erroneous and unlawful finding

2  of unsuitability and a release date was not set; Petitioner was

3  given a four (4) year denial, and did not appeal this decision

4  through the Administrative remedy, because the Board of Prison Terms

5  has eliminated the BPT Appeals Unit and no longer allows for the

6  filing of administrative appeals on BPT denials of parole for

7  indeterminately sentenced prisoners such as Petitioner. Petitioner

8  submits that the Board's regulation, that is the California Code

9  of Regulations (hereinafter "CCR"), 2402 (a), **DEMANDS that the Board**

10 **set a release date unless Petitioner CURRENTLY presents an**

11 **unreasonable risk of danger to the public.**

12    At Petitioner's Board hearing, the Board relied on the

13 commitment offense and prior history to justify it's unlawful finding

14 of unsuitability. Beginning at HT, p.41, the Board stated: "Certainly

15 this was an offense that was calculated..." Petitioner was convicted

16 of 2nd degree murder (see HT, p.1) which is a crime absent the

17 element of premeditation. There is no evidence that Petitioner's

18 crime was calculated.

19    At p. 42 of the HT, the Board stated Petitioner's motive for

20 the crime "was incredibly trivial" for denying him parole. However,

21 at p. 9 of the HT, Petitioner explained to the Board that the victims

22 drove at him with their car "in an attempt to kill him." Clearly

23 Petitioner's fear of being ran over by a car is not trivial. The

24 is no evidence that Petitioner's crime was trivial.

25    At p. 42 of the HT, the Board used Petitioner's prior criminal

26 history to deny him parole: "Prisoner does have an escalating pattern

27 of criminal conduct." The Board was referring to a juvenile arrest

28 for joy riding and two arrest as an adult, one for receiving stolen

1  property in September 1986, and for burglary in November 198¢, for

2  which he received County jail time and probation. Yet, these arrests

3  are not evidence that Petitioner "would currently pose an (sic)

4  unreasonable risk and danger to society or a threat to public

5  safety." (HT, p.41), since none of the arrests involved violence,

6  in addition to one arrest occurring while Petitioner was 17 years

7  old. There is no evidence that Petitioner is a <u>current</u> threat to

8  society by looking at his criminal history, all of which were

9  non-violent and committed 20 years ago when he was 17 and 18 years

10  old.

11      At p. 45 of the HT, the Board stated: "Prisoner does have a

12  history of unstable relationships with others and that would be

13  related to his prior criminal behavior..." There is no logical

14  connection between Petitioner's prior criminal conduct (joyriding

15  as juvenile, receiving stolen property and burglary) and the Board's

16  conclusionary assertion that Petitioner has a history of unstable

17  relationships with others. There is no evidence that Petitioner

18  has a history of unstable relationships.

19      Lastly, the Board denied Petitioner parole and used his in-

20  prison disciplinaries as evidence that he "pose[s] an unreasonable

21  risk and danger to society," if he was released at this time. (see

22  HT, p.41)

23      Of Petitioner's seven disciplinaries, only 3 are of note while

24  the remaining four were minor and involved no violence. The three

25  of note consisted of fist-fights with other inmates. Prison settings

26  are highly charged and tense environments where fist-fights are

27  not atypical occurrences. Petitioner has now spent more than 18

28  years in confinement and has only three fist-fights (in 1994, 1999,

1  and 2002 respectively) where no weapons were used and no serious

2  injuries occurred, with the exception of the 2002 incident. It is

3  not unreasonable, spending nearly two decades in prison where riots

4  are not uncommon and stabbings are the norm, that Petitioner was

5  involved in only fist-fights. Indeed, it could be construed to

6  be reasonable. Therefore, there is no evidence that Petitioner's

7  in-prison disciplinaries make him an unreasonable risk and danger

8  to society if he was released at this time.

9       Additionally the Board ignored that Petitioner has been deemed

10  by the California Department of Corrections a programming prisoner

11  with A-1A status, and further ignored that Petitioner's crime is

12  not "particularly egregious" by placing Petitioner in a Level II

13  prison setting for the past three years.[3]

14       Again, In re Norman G. Morrall, supra, the Court concluded

15  "A refusal to consider the particular circumstances relevant to

16  an inmate's individual suitability or parole would be contrary to

17  law." Moreover the Court in Biggs, supra, addressed the Board's

18  continued illegal usage of the crime and/or history to justify a

19  denial of parole:

20       "...a continued reliance on an unchanging factor, the
         circumstances of the offense and conduct prior to imprisonment,

21       runs contrary to the rehabilitative goals espoused by the prison
         system and could result in a due process violation." (Biggs,

22       supra, 334 F.3d at 917).

23  3- California Code of Regulations, Title 15, section 3375.2 subd.(7)(A) states:
    "An inmate serving any life term shall not be housed in a Level I or II facility

24  if any of the following case factors are present: The Commitment offense
    involved...unusual violence..." And on June 24, 2004, the Court of Appeal in In

25  re George Scott, supra, 119 Cal.App.4th at 892 fn.11, found that the Board's
    regulations provide that even if the crime is "exceptionally callous" an inmate

26  may be found suitable for parole. The Court declared that Under the Board's
    regulations, base terms for life prisoners are not calculated until after an inmate

27  is deemed suitable for relase. (§2282, subd.(a).) The regulations therefore
    contemplate that an inmate may be deemed suitable for release even though his

28  offense demonstrated 'exceptionally callous' disregard for human suffering."
    (§2402, subd.(c)(1)(D) (id.)

1    In _Biggs,_ supra, the appeal was pursuant to his initial
2  suitability hearing. The Petitioner has now had (2) Board hearings
3  and submits that his most recent denial rest on the commitment
4  offense, and therefore violates both State and Federal due process.
5  Most importantly, there is no evidence that the public requires
6  a lengthier period of incarceration (please refer to PC §3041(b))
7  In relation to other instances of the same crime (please refer to
8  3041.5).

9    Petitioner submits understanding and perspective of the crime
10  is compelled by the Board's own proportionately matrix (please refer
11  to CCR Division 2, §2403(c). The matrix scale and rating of the
12  more common and routine variations of murder appear to be
13  codification of when a crime of this nature can be more egregious
14  than average. Petitioner submits that his crime falls squarely in
15  the matrix. The Board fails in any attempt to substantiate why
16  Petitioner's crime is so heinous as to require that Petitioner be
17  expected time and time again from the general rule that a parole
18  date shall normally be set; please see _In re Rameriz,_ supra, wherein
19  the court:

20        **"The Board must weigh the inmate's criminal conduct not against
        ordinary social norms, but rather other instance of the same
21        crime or crimes. (_Rameriz,_ supra, 94 Cal.App.4th at p.570).**

22    Petitioner submits that the record is devoid of the Board making
23  such a comparison.

24    The Court in _Biggs_ supra, went on to warn the Board that while
25  there was "some evidence" to use the crime as a basis for denial
26  at his _initial_ hearing, the Board's continued use of the crime as
27  a basis for continuous denials would be violative of Bigg's Federal
28  due process rights. Petitioner  submits that the Board's usage of

1  the initial commitment offense and/or prior social history, as a

2  continued basis to deny him a parole date, has violated his 5th

3  and 14th Amendment rights under the United States Constitution to

4  not be deprived of his liberty. The Court in Biggs, supra, also

5  held:

6      "[T]o ensure that a state created parole scheme serves the
    public interest purposes of rehabilitation and deterrence,

7      the Parole Board must be cognizant not only of the factors
    required by state statute to be considered, but also the

8      concepts embodied in the Constitution requiring due process
    of law..." [please see e.g. in Greenholtz, 442 U.S. at 7-

9      8.]" (Biggs supra, 34 F.d at p.916)

10      "The Parole Board's sole supportable reliance on the gravity
    of the offense and conduct prior to imprisonment to justify

11      denial of Parole can be initially justified as fulfilling
    the requirements set forth by state law. Over time however,

12      should Biggs continue to demonstrate exemplary behavior and
    evidence of rehabilitation, denying him a parole date simply

13      because of the nature of his offense and prior conduct would
    raise serious questions involving his liberty interest in

14      parole...." (id).

15      Petitioner also submits that the Board has adopted an anti and/or

16  no parole policy per se, or a policy of underinclusion demonstrating

17  a policy of systematic bias; granting only an approximate 232 parole

18  dates out of over 11,000 Board hearings, thus violating the

19  legislative intent of PC § 3041.5, that "...a parole release date

20  shall normally be set in a manner that will provide uniform terms

21  for offenders with crimes of similar gravity and magnitude..." and,

22  petitioner's State and Federal due process rights as well (please

23  refer to In re Rameriz, supra, p.565). Petitioner contends that

24  the evidenced behavior by a quasi-judicial Board, of policy

25  demonstrating an approximate 98.5% denial rate, supports the premise

26  that such policy exist (i.e., anti and/or no parole policy, or,

27  a policy of underinclusion or systematic bias): this violates the

28  strictures of substantive due process.

The existence of said policy in denying parole may explain why the Board grants parole in less than two (2) percent of the cases it hears; it also explains the bias demonstrated in the present case.

In this case petitioner's own circumstance, the Board's pronouncement of numerous and unlawful conclusions is not supported by the evidence, and said violates the process due to petitioner under both the State and Federal Constitutions. Based upon the herein demonstrated bias, the Board's decision cannot be shielded by the "some evidence" standard. The only appropriate standard is independent review.

## CONCLUSION

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious (due to the Board carrying out it's political function of adhering to a no or anti-parole policy), due the Board's acting contrary to the intent and spirit of PC §3041(b) and, due to it's refusal to adhere to the aforementioned decisions and the controlling authorities.

Petitioner prays this Court order to discharged and/or released, or at the very least direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

///

# PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis

2. Appoint Counsel

3. Conduct an Evidentary Hearing;

4. Order Petitioner's appearance before the Court;

5. Order Petitioner taken back before the Board for a finding of suitability within ten (10) days, or in the alternative, order Petitioner released forthwith; and,

6. Declatory relief;

7. Any other relief this court deems fair, just and appropriate.

/ / /

/ / /

/ / /

/ / /

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

       (2) Nature of proceeding (for example, "habeas corpus petition"): _____

       (3) Issues raised: (a) _____

           (b) _____

       (4) Result *(Attach order or explain why unavailable)*: _____

       (5) Date of decision: _____

   b. (1) Name of court: _____

       (2) Nature of proceeding: _____

       (3) Issues raised: (a) _____

           (b) _____

       (4) Result *(Attach order or explain why unavailable)*: _____

       (5) Date of decision: _____

   c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
    There has been no delays.

_____

_____

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No.  If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☒ No.  If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   This court has original jurisdiction in habeas proceedings.

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 9/21/06         ▶ _____
                            (SIGNATURE OF PETITIONER)

# Exhibit A

CDC 128-B (Rev. 4/74)

NAME and NUMBER    DAO, AN    E28538    CFYWT2000000207U

On ___1/3/06___  I, Inmate **DAO**, CDC# E28538, received hearing transcripts from
      (DATE)

the Board of Prison Terms hearing that took place 6/27/2005.

_____
Inmate Signature

_____
Staff Member Signature

CTF                    INMATE COPY                    GENERAL CHRONO

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number E-28538
)
AN DAO )                     **INMATE**
)
)                              **COPY**
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 27, 2005

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Mr. Robert Harmon, Deputy Commissioner

OTHERS PRESENT:

Mr. An Dao, Inmate
Ms. Katera Rutlege, Attorney for Inmate
Mr. Alt Chrisopoulous, Attorney for Orange County
Mr. Thrung, Interpreter
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No          See review of Hearing
_____   Yes         Transcript Memorandum

**Jennyfer Osecheck, Peters Shorthand Reporting**

RECEIVED
JUL 2 8 2005
BY: CTF

ii

## INDEX

PAGE

Proceedings ............................................... 1

Case Factors .............................................. 7

Post-Commitment Factors ................................. 15

Parole Plans ............................................ 12

Closing Statements ...................................... 35

Recess .................................................. 40

Decision ................................................ 41

Adjournment ............................................. 47

Transcriber Certification ............................... 48

--oOo--

1

1      P R O C E E D I N G S

2          **PRESIDING COMMISSIONER FISHER:** This is going to

3      be a subsequent parole consideration hearing for An

4      Dao CDC number E 28538. Today's date is June 27, 2005.

5      We are located at the correctional Training Facility.

6      Inmate was received on August 31, 1989 from Orange

7      County, the life term began at August—I'm sorry on

8      June 12, 1992 and the minimum eligible parole date is

9      January 8, 2003.  The controlling offense which the

10     inmate has been committed is second degree murder case

11     number C 70863 Count 1 Penal Code Section 187; there

12     was an additional finding of use of a firearm Penal

13     Code Section 12023.5 there was also Count 2 of

14     attempted murder for 664187 with a use of a firearm

15     Penal Code Section 12022.5 inmate received a term of

16     22 years to life once again the minimum eligible

17     parole date is January 8, 2003.  Mr. Dao we are tape-

18     recording today for the purpose of voice

19     identification for the transcriber. We are going to

20     say our first and last names and spell our last name.

21     When I get to you I need your CDC number also.  Ok, I

22     am going to start with myself and go to my left, Susan

23     Fisher, F-I-S-H-E-R, commissioner.

24          **DEPUTY COMMISSIONER HARMON:**  Robert Harmon, H-

25     A-R-M-O-N, Deputy Commissioner.

26          **ATTORNEY CHRISOPOULOUS:** Alt Chrisopoulous, C-H-

27     R-I-S-O-P-O-U-L-O-U-S, Deputy District Attorney,

2

1    County of Orange.

2         **ATTORNEY RUTHLEDGE:**  Katera E. Rutledge, R-U-T-

3    L-E-D-G-E, Attorney for Mr. Dao.  Go ahead.

4         **INMATE DAO:**  Dao, D-A-O, E 28538.

5         **PRESIDING COMMISSIONER FISHER:** Thank you.

6         **MR. THRUNG:** (indiscernible)

7         **PRESIDING COMMISSIONER FISHER:** thank you, I

8    need to swear you in, ok, do you solemnly swear from

9    the interpretations that you give at this hearing will

10   be the truth and nothing but the truth.

11        **MR. THRUNG:**  Yes I do.

12        **PRESIDING COMMISSIONER FISHER:** All right thank

13   you. I would also like to note for the record two

14   correctional officers present who are here for

15   security purposes only will not be participating in

16   the hearing.  Mr. Dao before we get started I need to

17   ask you to read that Americans with Disabilities Act -

18   that is there on the table in front of you.   If you

19   would just read it out loud for us in to the record

20   please.

21        **INMATE DAO:**  The Americans with Disabilities

22   Act, ADA, is a law to help people with disabilities.

23   Disabilities are problems that make it harder for some

24   one for people to see, hear, breathe, talk, walk,

25   learn, think, work, or take care of themselves than it

26   is for others. Nobody can be kept out of public places

27   or activities because of a disability.  If you have a

3

1     disability, you have a right to ask for help to get

2     ready for your BPT hearing, get to the hearing, talk,

3     read forms and papers, and understand the hearing

4     process.  BPT will look at what you asked for to make

5     sure that you have a disability that is covered by the

6     ADA, and that you have asked for the right kind of

7     help.  If you don not get help or if you don't think

8     you got the kind of help you need, ask for a BPT 1074

9     Grievance Form.  You can also get help to fill it out.

10         **PRESIDING COMMISSIONER FISHER:** Thank you, do

11    you understand that

12         **INMATE DAO:** Yes, ma'am.

13         **PRESIDING COMMISSIONER FISHER:** All right, I do

14    want to note on September 14, 2004, Mr. Dao did sign

15    the BPT 1074 form stating he had no disabilities. I

16    have some questions that I have to ask you though

17    before we can move on.  Do you have any problems

18    walking up and down stairs or walking distances?

19         **INMATE DAO:** No.

20         **PRESIDING COMMISSIONER FISHER:**  Ok, do you

21    usually wear glasses to read?

22         **INMATE DAO:** No.

23         **PRESIDING COMMISSIONER FISHER:**  Do you have any

24    hearing problems?

25         **INMATE DAO:** No.

26         **PRESIDING COMMISSIONER FISHER:**  Have you ever

27    been included in the triple CMS or EOP programs?

4

1        INMATE DAO: No.

2        PRESIDING COMMISSIONER FISHER: And, prior to

3    coming to prison for this crime how far did you get in

4    school?

5        INMATE DAO:  Eleventh grade.

6        PRESIDING COMMISSIONER FISHER r:  Ok, is there

7    any disabilities that you have that you think would

8    prevent you from being able to participate today in

9    the hearing?

10        INMATE DAO:  No ma'am.

11        PRESIDING COMMISSIONER FISHER:  Ok, thank you.

12    All right, this hearing is being conducted pursuant to

13    Penal Code Sections 3041 and 3042, and the rules and

14    regulations of the Board of Prison Terms that govern

15    parole consideration hearings for life inmates.  We

16    are going to be deciding today, Mr. Dao, whether or

17    not we find you suitable for parole, if we do find you

18    suitable today we are going to explain to you what the

19    length of your confinement will be. How much longer

20    you will be in prison.  Ok, we have had the

21    opportunity to review your files and we are going to

22    give you the opportunity to make any corrections that

23    you need to.  All right, before I recess for us to

24    deliberate, I am going to give you and you're

25    attorney, as well as the District Attorney the

26    opportunity to make a final statement about your

27    suitability.  I want to remind you, you are not

5

1    required to admit or discuss the offense today, but

2    the panel does accept the findings of the court to be

3    true.  Do you understand that?

4         INMATE DAO: Yes ma'am.

5         PRESIDING COMMISSIONER FISHER:  Ok, the

6    California Code of Regulations states that regardless

7    of time served a life inmate shall be found unsuitable

8    for and denied parole.  If in the judgment of the

9    panel he would pose an unreasonable risk of danger to

10   society if released from prison.  You have rights that

11   are related to this hearing, that include the right to

12   a timely notice of this hearing, the right to review

13   your central file, and the right to present relevant

14   documents.  Counsel have your clients' rights been

15   met?

16        ATTORNEY RUTLEGE: Yes.

17        PRESIDING COMMISSIONER FISHER: All right, you

18   also have the right, Mr. Dao, to an impartial panel.

19   Now that you have seen your two panel members today,

20   do you have any objections to your panel?

21        INMATE DAO:  No ma'am.

22        PRESIDING COMMISSIONER FISHER:  OK, counsel any

23   objections to the panel?

24        ATTORNEY RUTLEGE:  None.

25        PRESIDING COMMISSIONER FISHER:  Ok, I am going

26   to give you a written copy of our decision today, Mr.

27   Dao, it will be a tentative decision that will be

· 6

1    effective within a hundred and twenty days, and a copy

2    of the decision and a copy of the transcript of your

3    hearing will be sent to you.  Now in, May of last year

4    they changed the way you that you appeal board

5    decisions, now all appeals of board decisions go

6    directly to the courts, so if you need additional

7    information about that your correctional counselor

8    would have it. Also it should be in the prison

9    library.  There is a prison library here.  Is there

10   any confidentials today?

11        **DEPUTY COMMISSIONER HARMON:** No.

12        **PRESIDING COMMISSIONER FISHER:** Could you hand

13   this over to the attorney's (indiscernible)?

14        **DEPUTY COMMISSIONER HARMON:** Counsel.

15        **PRESIDING COMMISSIONER FISHER:**  Could you take

16   a look at that and just make sure you have the same

17   things that I have on my checklist.  Do you have

18   everything?

19        **ATTORNEY RUTLEDGE:**  Yes.

20        **PRESIDING COMMISSIONER FISHER:**  Could you hand

21   that to Mr. Chrisopoulous?

22        **ATTORNEY RUTLEDGE:**  And he gave us something

23   today.

24        **PRESIDING COMMISSIONER FISHER:**  Ok.

25        **ATTORNEY CHRSOPHOLUS:**  Yes, I have everything.

26        **PRESIDING COMMISSIONER FISHER:**  Ok, great thank

27   you.  All right is there any thing that needs to be

1    submitted?

2         ATTORNEY RUTLEDGE:  Note, do you have the

3    current letters from the family.  They should be in

4    there.

5         **PRESIDING COMMISSIONER FISHER:**  I do have

6    letters, let me see what I got, yah, most of them are

7    dated October of 2004 it looks like.  So, those are

8    most recent since the last hearing, do you have any

9    preliminary objections?

10        **ATTORNEY RUTLEGE:**  No.

11        **PRESIDING COMMISSIONER FISHER:**  Is Mr. Dao

12   going to be speaking with us?

13        **ATTORNEY RUTLEGE:**  He will speak on some issues

14   however; he is not going to discuss the circumstances

15   of the incident or anything up to the point of

16   incarceration.

17        **PRESIDING COMMISSIONER FISHER:**  Ok, Mr. Dao if

18   you would raise your right hand and I will swear you

19   in.  Do you solemnly swear and affirm that the

20   testimony you give at this hearing will be the truth

21   and nothing but the truth?

22        **INMATE DAO:**  Yes ma'am.

23        **PRESIDING COMMISSIONER FISHER:**  All right,

24   Counsel I am going to use the February 1991 appellate

25   decision for the summery of the crime, then I will go

26   to the December 2001 calendar board report for the

27   prison (indiscernible), if you have no objections?

1    This starts on page two, the bottom of page two. It
2    says, in the wee hours of April 22 1988, Lan Thomason,
3    L-A-N, last name T-H-O-M-A-S-O-N, I'm going to have to
4    spell these names. T-H-A-C - last name L-E, Hong
5    Truong, H-O-N-G T-R-U-O-N-G, Anthony Linn, usual
6    spelling, Baou Lam, B-A-O-U L-A-M, Khang Nguyen, K-H-
7    A-N-G N-G-U-Y-A-N and Natalie Huong, H-U-O-N-G, left
8    the Saigon Cabaret and drove a short distance in
9    various vehicles to the TU-HAi restaurant, that's T-U
10   hyphen H-A-I, in the city of Garden Grove.  Inside,
11   Thomason and Linn got into and argument, although Dao
12   and (indiscernible) reported to calm things by
13   apologizing for his behavior, the members of the two
14   groups shook hands.  Feelings of hostility pervaded
15   the atmosphere.  Thomason and her friends thought it
16   wise to leave camp without eating.  They were
17   confronted by the defendants in the parking lot.  The
18   witnesses gave a welter of conflicting stories that
19   boiled down to this; Defendants fired numerous rounds
20   from one to two weapons at the two victims departing
21   in separate vehicles, when the smoke cleared Khang
22   Nguyan was dead and two of the defendants had fled.
23   After changing his shirt Linn returned to the interior
24   of the restaurant.  All right, we are going to the
25   inmate's version.  This is December 2001 Calendar
26   Board Report.  The prisoners version, it says Dao
27   stated while Tim Linn was having an argument at the

9

```
 1    victims table, he went over to apologize, they did not
 2    say anything but they went to the car and reached
 3    inside, when they came back inside the restaurant
 4    there actions made them think they had a gun. Because
 5    of there behavior when he was outside in the parking
 6    lot he thought a car and truck were driving towards
 7    him in an attempt to kill him.  For this reason he
 8    states he fired to gun at a vehicle, but could not
 9    remember which vehicle he fired at and that he fired
10    in self-defense.  He also stated he did not know he
11    was responsible for killing the victim or not.  He
12    stated that he just happened to be at the restaurant
13    at the time of the offense, and that he obtained the
14    weapon from quote "someone on the street;".  He also
15    stated he did not know his co-defendants or the
16    victims and stated he felt that someone was trying to
17    kill him and that he had to defend himself and did not
18    feel he did anything wrong.  He also added that he had
19    been drinking.  OK, I am going to move on to his
20    social history, starting with any prior contacts with
21    law enforcement, I am just reading directly from this
22    2001 Board Report, Under preconviction factors it says
23    that under juvenile record he was picked up in
24    September of 1985 for taking a vehicle without
25    permission and he was made a ward of the court and
26    ordered to spend fifteen days on the community work
27    program.  Under adult convictions it said that in
```

10

1    September of 1986 he was arrested for receiving stolen

2    property, convicted, received three years formal

3    probation and forty-five days in jail.  1986 in

4    November he was arrested for burglary, convicted, and

5    received three years in formal probation, and ninety

6    days in jail.  Does that sound correct?

7          INMATE DAO:  Yes ma'am.

8          PRESIDING COMMISSIONER FISHER:  All right,

9    under social factors it says you were born in Vietnam

10    in 1968 and that you have eight brothers and sisters,

11    is that right?

12          INMATE DAO:  Yes ma'am.

13          PRESIDING COMMISSIONER FISHER:  Ok, are your

14    parents still alive?

15          INMATE DAO:  Yes ma'am.

16          PRESIDING COMMISSIONER FISHER:  Ok, what about

17    your brothers and sisters?

18          INMATE DAO:  Yes ma'am.

19          PRESIDING COMMISSIONER FISHER:  Ok, are you in

20    contact with all of them?

21          INMATE DAO:  Yes, ma'am

22          PRESIDING COMMISSIONER FISHER:  I know I have

23    letters from several people in your family.  When did

24    you come to the United States?

25          INMATE DAO: 1982.

26          PRESIDING COMMISSIONER FISHER:  And how old

27    were you?

11

1          **INMATE DAO:**  I was fourteen years old.

2          **PRESIDING COMMISSIONER FISHER:**  You went to La

3     Quinta High school

4          **INMATE DAO:** I was enrolled in first

5     (indiscernible) in La Quinta and (indiscernible)

6          **PRESIDING COMMISSIONER FISHER:**  Ok, all right

7     did you say Garden Grove High school; first is that

8     the first one you went too.

9          **INMATE DAO:**  No, (indiscernible) high school

10         **PRESIDING COMMISSIONER FISHER:**  Mulsa  high

11    school, oh alright

12         **INMATE DAO:**  In Garden Grove City.

13         **PRESIDING COMMISSIONER FISHER:**  Ok, I know

14    where it is.  Lets see it says you discontinued your

15    education at the age of 18; did you drop out of

16    school?

17         **INMATE DAO:** I got expelled from school

18         **PRESIDING COMMISSIONER FISHER:**  What for?

19

20         **PRESIDING COMMISSIONER FISHER:**  Ok, and it says

21    you went to work, what did you do for work after you

22    got…

23         **INMATE DAO:**  (indiscernible).

24         **PRESIDING COMMISSIONER FISHER:**  Ok, all right

25    lets see here.  You have never been married, right?

26         **INMATE DAO:** NO.

27         **PRESIDING COMMISSIONER FISHER:**  No children?

12

1          INMATE DAO:   No.

2          PRESIDING COMMISSIONER FISHER:   Ok, and as far

3    as drugs and alcohol, says you haven't used any drugs,

4    it that right?

5          INMATE DAO:   No, oh… yes, yes.

6          PRESIDING COMMISSIONER FISHER:   What? No you

7    haven't ok.  I was going to ask you to clarify that

8    and you have never had any real problem with alcohol

9    but you did some drinking.  What about, oh never mind,

10   alright is there anything else about your life prior

11   to coming to prison for this crime that we haven't

12   talked about that you think we should know?

13         INMATE DAO:   No.

14         PRESIDING COMMISSIONER FISHER:   All right, lets

15   see here lets talk about your parole plan.  It says

16   here that you would live with your mother and father

17   and they are in Corona?

18         INMATE DAO:   Yes, ma'am.

19         PRESIDING COMMISSIONER FISHER:   Ok, It says

20   that your family owns a small manicure shop and that

21   you in the state of Ohio and I know I saw letters

22   regarding employment at the manicure shop, what would

23   you do for work if you were in Corona?

24         INMATE DAO:   Assistant Manager for my brother.

25         PRESIDING COMMISSIONER FISHER:   That's right

26   the Ontario Nail and Spa.  Ok, I thought I had seen

27   that also, ok, let me tell you what I have in the way

1    of letters; I have several letters from your siblings,

2    I have one here from your brother Russell they all

3    basically say the same thing.  Although he is the one

4    who is, the, he's the manager for the shops right?

5         INMATE DAO:  He's the owner of the shops.

6         PRESIDING COMMISSIONER FISHER:  Is he? Ok, oh

7    that's right I see what is says here he would employ

8    you as an assistant manager. Is that right?

9         INMATE DAO:  Yes.

10        PRESIDING COMMISSIONER FISHER:  I will also

11   provide him with housing, transportation, clothing,

12   and financial and moral support when he returns home.

13   And he owns the Ontario Nail and Spa in Corona and the

14   Tyler Ranch one in Riverside.  Ok, I have a letter

15   here from your parents, were writing you to show our

16   unconditional support to our son for the upcoming

17   parole consideration hearing.  They talk about Russell

18   and the fact he owns these two businesses and it says

19   he has offered you a job as an assistant manager in

20   Corona.  It says we will provide him with his housing,

21   clothing, transportation, financial needs, and moral

22   support when he returns home from prison.  This one is

23   from your brother in law.

24        INMATE DAO:  Yes ma'am.

25        PRESIDING COMMISSIONER FISHER:  And I think

26   probably also your sister, his wife.  We will support

27   him unconditionally when he returns home from prison,

14

```
 1    we will help him in any way we can to do well in the

 2    community we will provide housing, transportation,

 3    clothing, and financial support.  I have one here from

 4    three of you nieces and nephews, Lin Tron, Hong Tron,

 5    and Pal Tron and it just says they would like for you

 6    to come home and they love you very much.  I have one

 7    from your uncle, is it Hoang Dao?  H-O-A-N-G, is it

 8    Hoang?

 9            INMATE DAO:  Yes, ma'am  H-O-A-N-G.

10            PRESIDING COMMISSIONER FISHER:  H-O-A-N-G?

11            INMATE DAO: That's my nephew.

12            PRESIDING COMMISSIONER FISHER:  Oh, ok, I'm

13    sorry, I thought that it said you were his nephew and

14    I was reading the sentence backwards here.  It says I

15    am writing a short letter to support my uncle to

16    released from prison so I can play with him at home.

17    Here is one here from your sister Lisa, same thing, it

18    says she will provide, all the things you need.  Also

19    from your younger, your younger brother.  He's the

20    manager of one of the nail shops right?  Ok, same

21    thing he would provide you housing, clothing, and

22    funds for you to purchase a car.  Our family will

23    unconditionally support my brother upon his return

24    home.  And your oldest brother says that he and his

25    wife will unconditionally support you when you are

26    released from prison that he's in Ohio and that he

27    would provide you a home if you could parole to Ohio
```

1    also transportation and financial needs.  And then

2    several other of your nieces and nephews, one, two,

3    six, seven of them living in Cincinnati says we write

4    this letter to support uncle to be released from

5    prison.  I have one here from your youngest sister

6    Alison, the same thing, that she has a home in the Bay

7    Area and that you are always welcome there that she

8    will support you by providing housing, transpiration,

9    financial needs.  And then one from Candy, your sister

10    Candy and that says the same thing, as far as what she

11    would provide you with.  Is there anything else about

12    parole plans that we should know that I haven't talked

13    about?

14    **INMATE DAO:**  No.

15    **PRESIDING COMMISSIONER FISHER:**  Ok, all right,

16    then if you will turn your attention to Commissioner

17    Harmon, He is going to go through your post-commitment

18    factors.

19    **DEPUTY COMMISSIONER HARMON:**  Yes, good

20    afternoon.  I want you to listen very carefully if the

21    information I am providing is inaccurate then we need

22    to correct it for the record it does show your initial

23    hearing and only hearing so far was January 30, 2002,

24    and at that time you received an three year denial.

25    You received a CTF January 10, 2001 from SETEF.   Your

26    current custody level is Medium A with a revised class

27    score of 19, does that all sound right to you?

16

1          **INMATE DAO:**  Yes sir.

2          **DEPUTY COMMISSIONER HARMON:**  Ok, listen very

3     carefully I am going to take parts of you counselors

4     report we are going to focus on the period of time

5     since your last hearing ok.   You can add to that if

6     you want but the counselor says that on September 18,

7     2002 Dao was removed from the general population and

8     placed in ASU for battery on inmates Pham and Vu with

9     serious injury.   It says that your custody was

10    increased to max on September 26, 2002.  It says that

11    you in the area of vocational training it says you

12    have continued as a student in the vocational

13    upholstery shop until September 18, 2002.  You

14    received satisfactory grades. You received various

15    certificates for your programming in upholstery.

16    Certificates of achievement and then on October 31,

17    2002 you received your certificate of completion in

18    vocation upholstery and lets see your, then the

19    counselor goes on there were no academics during this

20    period.  It says you were participating with NA and NA

21    based on various chronos.  You were participating in

22    Project Change based on a chorono in June of 2002

23    there was no psychiatric treatment and then it says

24    the RVR was reduced to mutual combat with serious

25    injury.  And then it says in August 7, 2003 you were

26    released back to general population.  It says this is

27    from October 2003 to September 2004 you made a CTF for

1      a general population medium A custody, it doesn't show

2      any work during this period.  No group, no psychiatric

3      treatment, no negative discipline.  Now that brings us

4      up to September 2004 and the counselor did not submit

5      the addendum from September 2004 to today June 27.  So

6      for the last say seven or eight months what have you

7      been doing?  Have you been are you currently

8      unassigned or have you received work permit

9              INMATE DAO: I am working now.  I have a job see

10     in I think in November, November of last year.

11             DEPUTY COMMISSIONER HARMON:  Ok, where you

12     assigned

13             INMATED DAO:  They send me to a lunch bar and

14     then I have (indiscernible).

15             DEPUTY COMMISSIONER HARMON:  Ok, and you have

16     been working since last November?

17             INMATE DAO:  Yes.

18             DEPUTY COMMISSIONER HARMON:  Ok, how about any

19     other activities, are you back in the 12-step program?

20             INMATE DAO:  No, but I on the waiting list.

21             DEPUTY COMMISSIONER HARMON:  Oh, ok how about

22     anything else over the last seven or eight months what

23     have you been doing?  For instance what do you do,

24     participate in any type of religious activities.

25             INMATE DAO:  I go to church that's it.

26             DEPUTY COMMISSIONER HARMON:  You do go to

27     church?

18

1          INMATE DAO:  Yes.

2          DEPUTY COMMISSIONER HARMON:  What kind of

3    church do you go to?

4          INMATE DAO:  I am Catholic.

5          DEPUTY COMMISSIONER HARMON:  Ok, do you go

6    regularly?

7          INMATE DAO:  Yah, every weekend.

8          DEPUTY COMMISSIONER HARMON:  Ok, do you, what

9    do you do for recreation?

10         INMATE DAO:  Play handball, exercising.

11         DEPUTY COMMISSIONER HARMON:  Do you do that

12    regularly?

13         INMATE DAO:  Yes.

14         DEPUTY COMMISSIONER HARMON:  Ok, do you go to

15    the library and read books.

16         INMATED DAO:  Sometimes.

17         DEPUTY COMMISSIONER HARMON:  What the last book

18    you read?

19         INMATE DAO:  I read a Vietnamese book.

20         DEPUTY COMMISSIONER HARMON:  Ok, what was it

21    on?

22         INMATE DAO:  It was on kung fu, it was a series

23    book.

24         DEPUTY COMMISSIONER HARMON:  Have you read any

25    books about human behavior, anger management, or

26    anything like that?

27         INMATE DAO:  No sir.

19

1        DEPUTY COMMISSIONER HARMON:  Ok, does that

2    pretty much bring us up to what you have been doing?

3        INMATE DAO:  I don't follow the question, can

4    you repeat.

5        DEPUTY COMMISSIONER HARMON:  In other words,

6    over the last seven or eight months is that what you

7    have been doing all together or is there anything we

8    have missed?

9        INMATE DAO:  No.

10        DEPUTY COMMISSIONER HARMON:  Ok, now over the

11    years you have been very active in vocational program

12    in 1995 you completed the vocational dry cleaning

13    program, right?

14        INMATE DAO:  Yes.

15        DEPUTY COMMISSIONER HARMON:  Going back to 1993

16    you completed a portion of the vocational graphic

17    program.

18        INMATE DAO:  Yes sir.

19        DEPUTY COMMISSIONER HARMON:  Did you ever

20    finish that; did you ever get the whole rest of it

21    done?

22        INMATE DAO:  Yah, Yah, I did.

23        DEPUTY COMMISSIONER HARMON:  I didn't see when

24    did you pick it up again?

25        INMATE DAO:  (indiscernible).

26        DEPUTY COMMISSIONER HARMON:  Well, in 1993 you

27    got the certificate of completion for a portion of the

1    program, where, where was the rest of the program, did

2    you finish that after 1993?

3         INMATE DAO:  What portion was it?   I complete

4    it.

5         DEPUTY COMMISSIONER HARMON:  Ok, I'll have to

6    go back and find it again.   Lets see you did the

7    vocational janitorial in 2001, and the vocational

8    upholstery that we talked about in 2002.  Did you

9    complete the vocational janitorial?

10        INMATE DAO:  Yes.

11        DEPUTY COMMISSIONER HARMON:  Ok, I saw that you

12   have 11 units but did not find a certificate of

13   completion and in the mill and cabinet program in 1999

14   you completed that, I found that.

15        INMATE DAO:  Yes.

16        DEPUTY COMMISSIONER HARMON:  Ok, in your files

17   there do you have the completion certificate for

18   graphic arts?

19        INMATE DAO:  Graphic arts, dry cleaning…

20        DEPUTY COMMISSIONER HARMON:  I know, just the

21   graphic arts, I know I've got all the other ones.

22        ATTORNEY RUTLEGE:  May I ask you Commissioner

23   Harmon, did I miss this, but I know he completed an

24   anger management course, did you come across that yet?

25        DEPUTY COMMISSIONER HARMON:  No, but Project

26   Change in 2002, is that what you are talking about the

27   44 week program, that touches on anger management and

1    other programs and other phases.

2             ATTORNEY RUTLEGE:  Is that the name, the anger

3    management course was called Project Change?

4             INMATE DAO:  Yah, that's right.

5             DEPUTY COMMISSIONER HARMON:  I'm just looking

6    for the certificate of completion for the janitorial

7    program, excuse me the graphic arts.

8             ATTORNEY RUTLEGE:  Is that it here?

9             INMATE DAO:  No that is (indiscernible).

10            DEPUTY COMMISSIONER HARMON:  Now, that is the

11   same one I think that I have, does it say, would you

12   read that counsel?  Does it say a portion of the

13   program, so we can make sure he understands what I am

14   saying.

15            INMATE DAO:  Here's the graphic arts.

16            ATTORNEY RUTLEGE:  Oh, right, this one says a

17   portion and then vocational auto painting, power saws.

18            DEPUTY COMMISSIONER HARMON:  Any of the auto

19   painting there?

20            ATTORNEY RUTLEGE:  Yah.

21            DEPUTY COMMISSIONER HARMON:  Any completed and

22   in what year?

23            INMATE DAO:  No I didn't complete that course.

24            ATTORNEY RUTLEGE:  Oh.

25            DEPUTY COMMISSIONER HARMON:  Ok, I didn't think

26   he did.

27            ATTORNEY RUTLEGE:  Auto painting what did it

22

1    say.

2              DEPUTY COMMISSIONER HARMON:   Is that just...

3              ATTORNEY RUTLEGE:   I am reading the bottom

4    lines.

5              DEPUTY COMMISSIONER HARMON:   The bottom lines,

6    if it says certificate of achievement at the top its

7    different from the certificate of completion.  So that

8    is why I want to make sure we differentiate.

9              ATTORNEY RUTLEGE:   Look for certificate of

10   completion.

11             INMATE DAO:   Graphic arts.

12             DEPUTY COMMISSIONER HARMON:   Its not to take

13   away, we, we can continue here and if he finds it or

14   you find it we, he's done a lot in the area of

15   vocational programs, I am just trying to croberate

16   what, what's been indicated and so those are basically

17   the jobs that you've held.  I did find the lunch box

18   crew, that you're current. I did find that in 2000 you

19   took a tape test and had a 12.9 plus.

20             INMATE DAO:   Yes sir.

21             DEPUTY COMMISSIONER HARMON:   It doesn't go any

22   higher than that, and you got your GED.    We talked

23   about Project Change; you've been in AA or NA in a

24   considerable period of time now?

25             INMATE DAO:   Yes.

26             DEPUTY COMMISSIONER HARMON:   Do you know the 12

27   steps?

23

1          **INMATE DAO:**  Only the first and second steps.

2          **DEPUTY COMMISSIONER HARMON:**  You've been in it

3      for a number of years though, right?

4          **INMATE DAO:**  Yes.

5          **DEPUTY COMMISSIONER HARMON:**  Why don't, why

6      don't you know all the steps?

7          **INMATE DAO:**  I know the first and second steps

8      that's it, cause I don't have no tutor or nothing like

9      that so I can't, can't get further than that.

10         **DEPUTY COMMISSIONER HARMON:**  I don't quite

11     understand your English reading skills are excellent,

12     I don't understand why you don't know the steps, you

13     can't score any higher on your testing.

14         **ATTORNEY RUTLEGE:**  I think he thinks what steps

15     he has completed.

16         **DEPUTY COMMISSIONER HARMON:**  Does he know the

17     12 steps, can you tell me the 12 steps right now?

18         **INMATE DAO:**  No I know the first step and the

19     second step that's it, I cannot go past the third

20     step.

21         **DEPUTY COMMISSIONER HARMON:**  Ok, counsel

22     doesn't want to go into the life crime, and I can't do

23     that but I think there was alcohol being used on the

24     day of the incident, so I can't go into that.  So it's

25     a good question.  I didn't find any other self-help

26     group programs, what other group programs has he been

27     involved in?

24

1           INMATE DAO:   That's it.

2           DEPUTY COMMISSIONER HARMON:   Did, do you do any

3       library work yourself.

4           INMATE DAO:   No.

5           DEPUTY COMMISSIONER HARMON:   You don't check

6       out books and read into human behavior and maybe how

7       it applies to you, you could kind of get an idea,

8       maybe problems with your own personality that you've

9       had to deal with since the incident.

10          INMATED DAO:   I will after this.  I didn't

11      know.

12          DEPUTY COMMISSIONER HARMON:   Ok, yah, if these

13      programs are not being offered to you then you need to

14      take advantage of the library, maybe, and look at

15      books and read books about human behavior.  Maybe do a

16      book report for the board, some people do that, so we

17      have a better idea what you have learned.

18          INMATED DAO:   Yes.

19          DEPUTY COMMISSIONER HARMON:   Did you find what

20      you were looking for counsel?

21          ATTORNEY RUTLEGE:   No, Mr. I did not, I will

22      have him look over it, I did not locate a completion

23      on the graphic arts.

24          DEPUTY COMMISSIONER HARMON:   Ok, but what we do

25      at this point though, is we have the vocational dry

26      cleaning, we have the vocational janitorial, right, we

27      have the vocational upholstery, and we have the mill

1    and cabinet.

2        **INMATE DAO:**  This is a completion.

3        **ATTORNEY RUTLEGE:**  There is more stuff in here,

4    there is lost of shot certificates.

5        **INMATE DAO:**  No, no this is a completion, this

6    is a copy of the completion right here, the main one I

7    probably sent home already.

8        **DEPUTY COMMISSIONER HARMON:**  Is that the one

9    you and I are talking about?

10        **DEPUTY COMMISSIONER HARMON:**  Notice at the top

11    if it says certificate of achievement.

12        **INMATE DAO:**  Yah, I think I probably sent it

13    home already. I will make a copy.

14        **DEPUTY COMMISSIONER HARMON:**  You haven't done

15    anything wrong, you have done very well in the are of

16    vocational programs, I am only trying to co-oberate

17    what you said in the past, that's all. I am not trying

18    to….

19        **INMATE DAO:**  I did complete the graphic arts

20    course.

21        **DEPUTY COMMISSIONER HARMON:**  Ok, we just have

22    to somehow confirm that, it has to be since 1993.

23        **INMATE DAO:**  Yes.

24        **DEPUTY COMMISSIONER HARMON:**  Ok, now you,

25    you've had seven 115's, you have had one since your

26    last hearing.  You have had three 128's the last one

27    October 17, 1993 that was for disobeying orders.  Now

26

1    the September 18, 2002 the mutual combat with serious

2    injury, I read that report, you were found guilty, you

3    had a hearing, and you were found guilty, it was

4    reduced because of the CDC's failure to bring it in a

5    timely manner, due process issues.  But the bottom

6    line is this, when you read the report you and another

7    inmate attached two other Vietnamese inmates and they

8    were not resisting you, not fighting you back or

9    anything.  Why did you do that?

10         **INMATE DAO:**  That not what happened.

11         **DEPUTY COMMISSIONER HARMON:**  I'm only going by

12    the reports.  I don't want to hold a trial here,

13    because you already had your hearing before the

14    Department of Corrections, I am just asking you, why

15    did it even happen?

16         **INMATE DAO:**  They attacked me first.  That part

17    the sergeant didn't say.  The sergeant also say I beat

18    up, while over that spot I never saw, but later they

19    changed the report they say he saw me because

20    (indiscernible).

21         **ATTORNEY RUTLEGE:**  If you have a copy of the

22    hearing notes, cause I have those, it does indicate

23    the officer did change what he initially wrote in the

24    report at the hearing.

25         **DEPUTY COMMISSIONER HARMON:**  Right.

26         **ATTORNEY RUTLEGE:**  A different statement so,

27    what would cooberate what he was saying.

1    **DEPUTY COMMISSIONER HARMON:**  Right, yes I read

2    it over but I guess what I am concerned about is

3    behavior, why did it have to happen?

4        **INMATE DAO:**  Because (indiscernible) was

5    picking on the old Vietnamese guy, I just wanted to

6    come and confront him, and tell he attacked me; the

7    head of family attacked me.  See that how it happened.

8        **DEPUTY COMMISSIONER HARMON:**  How would you

9    handle it different today?

10        **INMATE DAO:**  I could walk away from it.

11        **DEPUTY COMMISSIONER HARMON:**  Right.

12        **INMATE DAO:**  If I walk away from it, they keep

13    picking on the old man; see I just wanted to call them

14    out but then they attacking me, if today I just walk

15    away from it.

16        **DEPUTY COMMISSIONER HARMON:**  Ok, I wanted to

17    hear from you on it, not good, you know that, it's not

18    good..

19        **INMATE DAO:**  I know sir.

20        **DEPUTY COMMISSIONER HARMON:**  It shows violence,

21    not only that you other 115's also have violence in

22    the other 115's too that you've had. In 1999 battery

23    on inmate, fighting in 1994, you have to knock this

24    off, you just keeping yourself in prison you know

25    that.

26        **INMATE DAO:**  Because I was on level three or

27    level four.

28

1          DEPUTY COMMISSIONER HARMON:  Well, you answered

2    your own question your own question when you could of

3    walked away, everything I read shows me you· could have

4    walked away.  You've could have maybe handled it in

5    another manner, so you just creating your own

6    problems, I want you to understand that.  Let me ask

7    you this Mr. Dao, do you believe you pose a risk to

8    the people outside the prison walls today?  Do you

9    understand what I said?

10         INMATE DAO:  No.

11         DEPUTY COMMISSIONER HARMON:  Ok, why don't you

12    ask him what makes you a different man today than the

13    man that came into prison for the crime?

14         INMATE DAO:  Because I was so young at the time

15    I was stuck up and I did something I wasn't supposed

16    to do and right now I understand those things I did

17    was wrong and uh… (Indiscernible) nothing I can

18    change, unfortunately, if I can change it I change it.

19         DEPUTY COMMISSIONER HARMON:  Ok, did he finish?

20    Are you done?

21         INMATE DAO:  Yes.

22         DEPUTY COMMISSIONER HARMON:  Ok, were going to

23    go over the doctors reports, we are going to take the

24    last two reports, just parts of them you are more than

25    welcome to add the that if you feel its necessary when

26    I am done.  What I am going to start with is the

27    report of Jeff Howlin, H-O-W-L-I-N, he's a

1     psychologist that did a report in November of 2001 and

2     said at the time under psychosocial assessment

3     identifying information it says; you speak English

4     adequately for the purpose of this evaluation and then

5     as he goes into the body of the report a lot of it is

6     repetitive information on the area of clinical

7     assessment under current medical status and treatment

8     needs speaking of the day of the interview, it says he

9     was coherent , cooperative, calm and alert throughout

10    the interview.  His speech, flow of thought and affect

11    were all within the average range, his intellectual

12    functioning was estimated to be slightly below

13    average, slightly below average, to average, there was

14    no evidence of any mood or thought disorder.  His

15    judgment appeared to be sound, under current

16    diagnostic impressions, under Axis I adult anti social

17    behavior, Axis II no contributory personality disorder

18    Axis V a gap of 70, says inmate Dao's prognosis is

19    positive for being able to maintain his mental state

20    in the community upon parole in the are of review of

21    life crime, since he is not discussing this, since you

22    are not discussing it today.  I keep talking like I'm

23    (indiscernible).  Under the review of the life crime I

24    will write what the doctor wrote here says, inmate Dao

25    described the circumstances surrounding his commitment

26    offense in great detail , regarding the folding of

27    events the day of the crime.  This is in contrast to

1   the psychological evaluation done in 1995, in which
2   the inmate stated " I don't remember much about my
3   crime, it has been to long."   It says inmate Dao is
4   serving 15 year to life sentence with a seven-year
5   enhancement for second-degree murder.  He explained he
6   did not shoot anybody, but the victim was most likely
7   shot by a stray bullet fired form someone else,
8   somebody else.  He explained he accepts responsibility
9   in some ways for being involved in the situation
10  leading to somebody's death and feels sorry for the
11  victim but that he did not actually shoot anybody. He
12  did acknowledge shooting a weapon at the ground, but
13  not at a person denied being intoxicated at the time
14  on commitment offense.  Inmate Dao denied ever being
15  affiliated with any gang activity both prior to being
16  incarcerated and since his incarceration.  Under the
17  assessment of dangerousness impart if released in the
18  community his violence potential is estimated to be
19  slightly higher than the average citizen in the
20  community and violence potential within a controlled
21  setting is estimated to be slightly higher than the
22  average relative to the level two inmate population.
23  Clearly the most significant risk factor, which would
24  be a precursor to violence for this inmate would be
25  the use of alcohol and or drugs, there for if inmate
26  Dao again abuses substances his violence potential
27  would be considered significantly higher than the

1    average citizen in the community.  Clinical

2    observation, comments, and recommendations impart on

3    inmate Dao does not have a mental health disorder,

4    which would necessitate treatment either during his

5    incarceration period or following parole.  That is

6    signed by Doctor Howlin.  The prior report from David

7    Middleton, common spellings, Staff Psychologist, in

8    1995, Is the reference report as to the statement made

9    earlier and in that particular report, the Doctor in

10   the narrative portion, says inmate was asked about the

11   crime that was committed and says he doesn't "remember

12   that much about my crime it has been to long."  He

13   said he does not no the person who was killed but

14   knows that there was some sort of argument, he

15   explains that he tries to forget as " I know I am

16   responsible for it."  Mental status examination in

17   part; insight and judgment are good, impressions under

18   Axis I depressive disorder not otherwise specified,

19   Axis II diagnosis deferred, Axis V inmate is

20   exhibiting a good level of functioning.  That is part

21   of his report, nothing else I want to report on.  What

22   I have done there Mr. Dao is taken parts of your two

23   most recent Doctors reports, I have taken parts of

24   your counselors reports, I've taken parts of your

25   institutional adjustment, I may have left out areas

26   that are very important to you, I am going to return

27   to the chair here for questioning, but before I do is

1    there anything you wanted to add in any of those

2    areas.

3            INMATE DAO:  No sir.

4            DEPUTY COMMISSIONER HARMON:  Did we cover it

5    ok?

6            INMATE DAO:  Yes sir.

7            DEPUTY COMMISSIONER HARMON:  Oh, return to the

8    chair.

9            PRESIDING COMMISSIONER FISHER:  At your last

10   hearing, Commissioner Angele really lectured you about

11   115's.

12           INMATE DAO:  Yes, ma'am.

13           PRESIDING COMMISSIONER FISHER:  He told you

14   that was going to be the nail on the door.  That you

15   shouldn't get any more 115's before your next hearing,

16   do you remember that?

17           INMATE DAO:  Yes sir, I mean yes ma'am.

18           PRESIDING COMMISSIONER FISHER:  Ok, everybody

19   calls me sir, just something about my personality.

20   This was another serious one.

21           INMATE DAO:  Yes ma'am.

22           PRESIDING COMMISSIONER FISHER:  So, has

23   anything changed since you got this last 115 for

24   mutual combat?

25           INMATE DAO:  Yes, ma'am because I went down to

26   level two now so most the people are here.

27           PRESIDING COMMISSIONER FISHER:  You know what

33

1    it is not about the level of institution you are in,

2    it is how you handle things because we see inmates all

3    the time who have been in prison 20 years who haven't

4    had any 115's.  So what is different about the way you

5    would handle this?

6         INMATE DAO:  I say the people are very mellow,

7    I get along with everybody.

8         PRESIDING COMMISSIONER FISHER:  What if you get

9    on the outside and you run across someone who is not

10   very mellow, how are you going to handle things?

11        INMATE DAO:  Try to walk away (indiscernible).

12        PRESIDING COMMISSIONER FISHER:  Ok, any

13   questions?

14        DEPUTY COMMISSIONER HARMON:  My questions

15   revolve life crimes, so no.

16        PRESIDING COMMISSIONER FISHER:  Ok, Mr.

17   Chrisopoulous, any questions.

18        ATTORNEY CHRISOPOULOUS:  No.

19        PRESIDING COMMISSIONER FISHER:  Counsel any

20   questions?

21        ATTORNEY RUTLEGE:  Yes, for Mr. Dao, Mr. Dao

22   going back to this recent 115 that, what have you done

23   differently since then have you handling things

24   differently, can you give us examples how you are

25   dealing with other inmates and your attitude toward

26   those potential situations that would involve

27   violence?

34

1          INMATE DAO:  Now that I come to Solodad Central

2    right now, the people over here they are not like

3    people over there.

4          ATTORNEY RUTLEGE:  You do not feel as

5    threatened over here as you did.  Were you feeling in

6    a level three that you were in danger?

7          INMATE DAO:  Yes.

8          ATTORNEY RUTLEGE:  All right, and you went to

9    44 weeks of anger management, was that helpful for

10   you?

11         INMATE DAO:  yes a little bit because I soon

12   get involve in the fight after I go to the anger

13   management classes but what I did, I don't know if it

14   was helpful or not it do help a little bit to look at

15   things differently.

16         ATTORNEY RUTLEGE:  All right, no further

17   questions for Mr. Dao.

18         PRESIDING COMMISSIONER FISHER:  Thank you,

19   would you like to close?

20         ATTORNEY CHRISOPOULOUS:  Yes, thank you.  One

21   of the things Mr. Dao has stated is things he would do

22   differently now is he would walk away from situation,

23   yet in what is interesting to not the commitment

24   offense which happened 16 years ago, you have a

25   similar situation where some argument issued inside

26   the establishment, the victims party decided to leave,

27   not eat at this restaurant, decided to leave, at this

1    point that the inmate and his colleagues went outside

2    confronted the victim again as they were fleeing in

3    there vehicles and shot numerous shots at this fleeing

4    vehicle, ultimately killing one person and seriously

5    injuring another.  So there you a have a classic

6    example where whatever argument was finished over and

7    done with both sides could have left, yet you have the

8    inmate who decided to go outside with his colleague

9    and fire a gun. You have conflicting stories although

10    the inmate did not talk today as the reports indicate,

11    in 1995, the inmate states he doesn't remember much

12    about the crime, in 2001, he states while I didn't

13    shoot at anyone I just shot into the ground.  That

14    seems inconsistent with the facts of that particular

15    commitment offense.  Furthermore in the 2001

16    psychiatric report he states at the end he did not

17    feel he did anything wrong that day.  You have the

18    inmate who has some criminal history before coming to

19    the Department of Corrections, burglary, receiving

20    stolen property, but the most significant things here

21    are his post-conviction factors, and most recently

22    that vary serious 115 where it was battery on other

23    inmates which resulted in serious injury.  You have

24    the fact that in his prior hearing in 2002, he was

25    lectured on getting 115's in the future yet it seems

26    to have not put any sort of impression on this inmate.

27    At that time he receive a three year denial to focus

36

1    on remaining disciplinary free, furthermore you have

2    very little done in the way of AA meetings, he doesn't

3    know the 12 steps, yet that could be precursor to any

4    sort of violence in the future and was a precursor to

5    this commitment offense.

6        **ATTORNEY RUTLEGE:**  Excuse, me can I interrupt

7    for a minute, are we asking question or closing.

8        **PRESIDING COMMISSIONER FISHER:**  No, closing.

9        ATTORNEY RUTLEGE:  Oh, I'm sorry was it my

10   opportunity...

11       **PRESIDING COMMISSIONER FISHER:**  No, no you did

12   your questions he is closing.

13       **ATTORNEY RUTLEGE:**  Oh, ok.

14       **PRESIDING COMMISSIONER FISHER:**  And you will

15   close next.

16       **ATTORNEY CHRISOPOULOUS:**  There is no recent...

17       DE**PUTY COMMISSIONER HARMON:**  Excuse me

18   counselor.  Go ahead.

19       **ATTORNEY CHRISOPOULOUS:**  As I was saying the

20   lack of self help and therapy classes, the fact that

21   he could have been participating in reading and I

22   believe he answered the only books he has read

23   recently are kung fu books, he hasn't done any sort of

24   anger management reading one of the reports states. I

25   think the most recent Board report talks about the

26   last time he took AA participation was through 2002.

27   Obviously there are many areas of self help in group

1    therapy and anger management that inmate Dao needs

2    before he is anywhere close to being amenable to a

3    parole date and as the Deputy Commissioner stated he

4    has seven 115's in total and it is not just this most

5    recent one that deals with violence, there is the

6    fighting in 1994, the battery in 1999, and finally you

7    see the most recent psychological examination in that

8    we have puts his level of dangerousness as slightly

9    higher than other individuals in the community.  For

10   all these reasons and to impress upon Mr. Dao the need

11   to stay away from any disciplinary problems and the

12   need for self-help the people feel he should be given

13   a five-year denial.  Thank you.

14           **PRESIDING COMMISSIONER FISHER:**  Ok, Ms.

15   Rutlege, go ahead and close.

16           **ATTORNEY RUTLEGE:**  I wanted to, I think there

17   is a lot of good to look at and one thing I would like

18   to say I think Mr. Dao has been very candid with the

19   board today I think he is giving very candid answers

20   to things, he is telling you how it is.  He is not

21   trying to give you a good talk, his answers have been

22   very forthwith Mr. Dao came to CDC, actually the crime

23   was committed when he was 19 years old which was

24   sometime ago he has had some time adjusting since he

25   was incarcerated, however I would point out he has a

26   very low number of points his 115 that we have been

27   discussing today, a couple things about that, there

38

```
1    was some very conflicting testimony in that case he
2    spent nearly a year in Ad. Seg.  Over that and the end
3    result was the officer testified to something very
4    differently at the last hearing there was no, and if
5    you look through the report, actual medical evidence
6    of serious injury, it was.  I personally spoke to the
7    doctor, he told me it was a black eye and it was some
8    how not accurately reflected in the paperwork and that
9    happened in 2002 but overall he has had just one 115
10   in the past six years prior to that it was 1999 so it
11   has been just one in the past six years, which he
12   explained he was level three it sounds like there was
13   someone else being harmed, so it wasn't maybe a
14   situation where he was praying upon another inmate he
15   hasn't had any weapons or any other things of that
16   nature.  He has an excellent vocational record, it
17   seems that he may not be reading books but some of use
18   are a little bit more handy than academic and in his
19   case it might be the reading level for him is more fit
20   for karate.  I know attorneys who only read like
21   motorcycle magazines so I'm not sure that is
22   reflective of his, if he is not seeking self help,
23   self help maybe for him the vocational trade is a more
24   comforting place for him to go.  He did go to, I know
25   44 weeks of, of anger management and the Change course
26   again you know some people are a little more academic
27   than others he does enjoy a tremendous amount of
```

```
 1    family support you know we have letters, he has about
 2    nine or ten brothers and sisters a lot of Vietnamese
 3    families came over following the war the are all very
 4    productive people they all have businesses, jobs, his
 5    sister is a traveling nurse, I talked to her quite
 6    frequently, I mean he has you know a handful of people
 7    that are willing, and they don't mention his letters
 8    but I have talked to his family about this, they have
 9    the wherewith all to put him in any type of counseling
10    or therapeutic assistance parole would guide him to,
11    they have the ability and his sister being involved in
12    the medical profession would be able to support him in
13    that.    Also as far as the we don't have the current
14    psychological evaluation that would point out that one
15    was done sometime ago and the people are saying, kind
16    of inferring he is not taking responsibility, I heard
17    him say today that what he did was wrong and there was
18    a point where he did talk to one of the psychologists
19    about trying to forget because he felt responsible for
20    what had happened.    So I think that goes to the fact
21    he is taking responsibility and as far as the AA and
22    NA goes I want to point out he stopped going in 2002
23    he was in Ad. Seg. For 11 months so he didn't get out
24    until I believe August, he went in September of 2002
25    and got out in August of 2003 and sought, I guess he
26    is on a wait list now so I would ask the board provide
27    him with a date at this time if the board in the
```

40

```
 1    alternative feels he needs a little more time
 2    discipline free I would ask for a one year denial and
 3    some specific directions what he needs to be doing in
 4    that one year.
 5             PRESIDING COMMISSIONER FISHER:  Is there
 6    anything you would like to add to what your attorney
 7    said on your behalf?
 8             INMATE DAO:  No, ma'am.
 9             PRESIDING COMMISSIONER FISHER:  Ok, we are
10    going to go ahead and recess then.
11                          RECESS
12                          --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41

```
 1              CALIFORNIA BOARD OF PAROLE HEARINGS
 2                          DECISION
 3          PRESIDING COMMISSIONER FISHER:  All right, I
 4     want to note for the record that everyone who was
 5     previously in the room and identified themselves have
 6     returned to the room. Mr. Dao the panel reviewed all
 7     the information received from the public and relied on
 8     the following circumstances in concluding that you're
 9     not yet suitable for parole and would pose and
10     unreasonable risk and danger to society or a threat to
11     public safety if released from prison.  Certainly the
12     crime was the first thing we considered this was an
13     offense where there were two victims Khang Nguyan was
14     killed and Anthony Linn was injured according to the
15     information we have in the statement of fact this was
16     a situation where there was a verbal disagreement
17     between friends of the victims and friends of Mr. Dao
18     ultimately what ended up happening was the victims
19     were confronted by Mr. Dao and his friends in the
20     parking lot of a restaurant and Mr. Dao and his
21     friends fired numerous rounds at the victims killing
22     Khang Nguyan and one again injuring Anthony Linn.
23     Certainly this was an offense that was calculated they
24     were accosted in a parking lot and fired upon in a
25     situation where they certainly were helpless to defend
26     themselves against the attack and the motive for this
27     AN DAO    E-28538    DECISION PAGE 1    06/27/2005
```

42

```
1     crime was incredibly trivial it was a verbal argument
2     that lead to this murder and attempted murder.
3     Prisoner does have an escalating pattern of criminal
4     conduct, he did have an arrest as a juvenile for
5     taking a car he also had two arrests as an adult, one
6     for receiving stolen property in September of 1986,
7     one for burglary in November of 1986 those resulted in
8     county jail and probation.  Certainly he failed to
9     profit from societies previous attempts to correct his
10    criminality those would include the community work
11    program he was ordered to participate in as a
12    juvenile, and also the two crimes where he served time
13    in county jail and also was on probation he also was
14    on probation at the time of this offense.  He has
15    programmed in a limited manner while he has been
16    incarcerated and has not sufficiently participated in
17    self help because of disciplinary issues he was in a
18    situation that he was not able to do self help for
19    awhile but even at that he did participate at AA for a
20    length of time and still doesn't know the 12 steps
21    also he last attended self help in 2002 so there
22    hasn't been anything significant in the way of self
23    help programming in recent years.  He does have once
24    again seven 115's the last one was in September of
25    2002 and three of those 115's were for violent
26    behavior, there was battery in 1999, fighting in 1994,
27    AN DAO    E-28538    DECISION PAGE 2    06/27/2005
```

1    and mutual combat in 2002.·   He has had three 128's

2    (indiscernible) the last one was in October of 1993.

3    Psychiatric evaluation actually a psychological

4    evaluation dated November 2001 (indiscernible) but Dr.

5    Howlin is unfavorable. He noticed within a controlled

6    setting Mr. Dao would be a slightly higher than

7    average risk for future dangerousness relative to a

8    level two inmate population.  Also it states if

9    released to the community, his potential is estimated

10   to be slightly higher than average citizen, he talks

11   under his evaluation, under assessment of

12   dangerousness number C or letter C about the use of

13   alcohol and drugs and it says inmate Dao has denied

14   any substance abuse issues however CDC 115 violation

15   in 1994 related to the refusal to take a urine test

16   while being intoxicated he also admitted to having a

17   couple of beers on the day of his commitment offense

18   though as mentioned he denied being intoxicated

19   therefore if inmate Dao abuses substances his violence

20   potential would be considered significantly higher

21   than the average citizen in the community.  I want to

22   not in reading the decision from 2002, Commissioner

23   Angele talked about that at great length and the fact

24   that it was his opinion based on the fact there

25   was a residue of alcohol found in a cup in Mr. Dao's

26   cell that he felt that at the time if Mr. Dao had

27   **AN DAO    E-28538    DECISION PAGE 3    06/27/2005**

44

1    taken the urine test that he probably would have

2    tested positive. Significant unparticular because of

3    the length of time that he has participated in AA and

4    the fact that he doesn't know the 12 steps, therefore

5    he doesn't have the tools that he would need to deal

6    with alcohol the future. He does have good parole

7    plans and good family support, he had places to live,

8    he has financial support, and he has job offers. The

9    hearing panel noticed in response to 34 noticed the

10   district attorney of Orange County and the Garden

11   Grove police department both indicated opposition to

12   finding you suitability at this time. The panel finds

13   the prisoner needs to participate in self help in

14   order to understand and cope with stress in an non

15   destructive manner also in order to understand the

16   underlying factors that lead to this offense and his

17   continued violent behavior while he has been in

18   prison, prisoners gains are recent and he needs to

19   demonstrate and ability to maintain those gains over

20   an extended period of time it has only been three

21   years since he was involved in mutual combat in prison

22   in view of his assultive history continued negative

23   behavior, lack of program participation there is no

24   indication he would behave differently if paroled. We

25   want to commend you Mr. Dao for participating in

26   Project Change in 2002, and for participating in AA up

27   **AN DAO    E-28538    DECISION PAGE 4    06/27/2005**

1    until 2002 and also for being disciplinary free since
2    October of 2002, however currently the positive
3    aspects of behavior do not outweigh the factors of
4    unsuitability, in a separate decision the hearing
5    panel finds the prisoner has been convicted of murder
6    and attempted murder.  It is not reasonable to expect
7    that parole would be granted in a hearing during the
8    next four years, specific reasons for this finding are
9    as follows.  First of all, once again his commitment
10   offense, there were two victims here, two victims who
11   got into a verbal disagreement with Mr. Dao's friends
12   and one of them ended up dead and one ended up
13   injured.  The offense was certainly a calculated
14   offense and the motive for this crime was very very
15   trivial in relation to this offense. Prisoner does
16   have a history of unstable relationships with others
17   and that would be related to his prior criminal
18   behavior and he recently committed a serious
19   disciplinary violation since his last board hearing
20   and that was the mutual combat in 2002.  Also that is
21   significant because of the other violent 115's he's
22   received, he's had three of them since 1999.  A recent
23   psychological evaluation dated November 2001 authored
24   by Dr. Howlin indicates a need for longer period of
25   observation and an evaluation or treatment and the
26   prisoner has not completed necessary programming,
27   AN DAO    E-28538    DECISION PAGE 5    06/27/2005

1    which is essential to his adjustment and needs

2    additional time to complete such programming in the

3    area of self help. So, you know Commissioner Angele

4    was real strong with you about 115's when he spoke to

5    you at your last hearing, I am concerned today Mr. Dao

6    when I asked you what was different about you, you

7    said you would handle things differently now, and what

8    you said was the people over here are different and it

9    doesn't matter if the people here are different what

10   matters is if you are different and if you, if your

11   solution to not acting out violently is that you have

12   to be among people who don't challenge you then you

13   are going to have a tough time if you get a release

14   date. I am also very concerned that you have

15   participated in AA and haven't taken it seriously

16   enough to learn the steps. You really have to stay

17   disciplinary free, you have to, you're a lifer every

18   115 you get is going to drop your release date another

19   x number of years, so you have to stay disciplinary

20   free and you really need to participate in self help

21   in a meaningful way and you need to be able to come

22   back to the board and demonstrate to the board you are

23   learning something from that self help, that will

24   benefit you when you get outside, so the

25   recommendations we have for you is that you get

26   involved in self help in the institution or you get

27   AN DAO    E-28538    DECISION PAGE 6    06/27/2005

```
 1    involved in self help on your own through books or
 2    tapes, whatever you can get in the library and bring
 3    back a book report on some kind of evidence to the
 4    panel that shows that you actually learned something
 5    from that participation and once again it is
 6    absolutely imperative that you stay disciplinary free,
 7    regardless of the people around you, you need to be
 8    able to control yourself.  And that completes the
 9    reading of the decision.  Do you have any comments?
10             DEPUTY COMMISSIONER HARMON:  I don't think
11    there is anything else I can add so I wish you luck
12    sir.
13             PRESIDING COMMISSIONER FISHER:  Thank you, that
14    completes the hearing.
15                           --oOo--
16
17
18
19
20
21
22
23    PAROLE DENIED FOUR YEARS
24    THIS DECISION WILL BE FINAL ON:____OCT 2 5 2005____
25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,
26    THE DECISION IS MODIFIED.
27    AN DAO    E-28538    DECISION PAGE 7    06/27/2005
```

48

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JENNYFER OSECHECK, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 47, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF AN DAO, CDC NO. E-28538, ON JUNE 27, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated July 7, 2005, at Sacramento, California.

_____
Jennyfer Osecheck
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

**PROOF OF SERVICE BY MAIL**
**BY PERSON IN STATE CUSTODY**
(C.C.P. §§ 1013(A), 2015,5)

I, _An Dao_ , declare:

I am over 18 years of age and I am party to this action. I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California. My prison address is:

_An Dao_ , CDCR #: _E-28538_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _V-207(U)_
SOLEDAD, CA 93960-0689.

On _9/24/06_ , I served the attached:

_Writ of habeas corpus; Exhibit A (Hearing Transcript)_

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined. The envelope was addressed as follows:

_State of California_
_Attorney General_
_455 Golden Gate Ave., Suite 11000_
_San Francisco, CA 94102-7004_

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _9/24/06_ .

_An Dao_
Declarant